# Acquisition of Land by the Department of the Air Force

The requirement in 40 U.S.C. § 255 that the Attorney General review and approve the sufficiency of title to land prior to its acquisition by the government applies to all federal land acquisitions, except those specifically exempted from it, including the acquisition of land proposed by the Air Force in this case. The statutory provision which allows the Air Force to begin construction on land before its title is approved does not create an exception to the generally applicable requirement in 40 U.S.C. § 255, but is merely intended to allow military construction projects to get underway pending a determination on the validity of title.

Under regulations promulgated by the Attorney General, which are binding on agencies to which he had delegated his authority to approve title, less than fee simple title may not be approved for lands on which the United States is placing permanent improvements, except where Congress has authorized a lesser estate. Even where Congress arguably authorized acquisition of a lesser estate, the Attorney General and his delegees are still responsible for determining whether the title to be acquired in a particular case is sufficient for the intended government purposes.

The title proposed to be acquired from the Colorado State Board of Land Commissioners in this case—a right-of-way subject to a reversion interest—is not sufficient under Colorado law to protect the interests of the federal government where the Air Force intends to build a multimillion dollar military complex on the land.

June 28, 1982

## MEMORANDUM FOR THE ASSISTANT ATTORNEY GENERAL, LAND AND NATURAL RESOURCES DIVISION

This responds to your request for advice on several issues arising out of the Department of the Air Force's proposed acquisition of land in Colorado for construction of a Consolidated Space Operations Center (CSOC). You have asked whether the Attorney General must review the sufficiency of the title to the land in Colorado on which the CSOC will be based. We agree with your determination that the Attorney General must review the sufficiency of the title to the land, and would further advise that the title is not sufficient for the purposes for which it is being acquired.

We should state at the outset that the Land and Natural Resources Division has been delegated the authority to exercise the Attorney General's discretion in matters of title approval. 28 C.F.R. § 0.66 (1981). Our comments concerning the exercise of that discretion should not be viewed in any sense as a preemption of your duty to make the final decision.

# I. Background

The CSOC is planned as a center for Air Force activities involving military operations in space. The land in question consists of 640 acres in Colorado presently owned by the State of Colorado. The Air Force plans to spend approximately $150 million constructing the CSOC, as well as additional sums over the years on maintenance and expansion. The deed between the state and the Air Force, as presently drafted, would give the United States a "right-of-way in perpetuity" over the 640 acres.[1] The right-of-way would revert to the state if it were no longer used for governmental purposes. Draft Agreement, ¶ 7. Colorado would retain mineral and water rights, and the land would be subject to existing easements and rights-of-way. *Id.*, ¶¶ 5, 6, 9.

## II. Sufficiency of the Title Must Be Reviewed by the Attorney General or His Designee

Since at least 1841,[2] one of the Attorney General's formal functions has been to examine and approve the sufficiency of land titles prior to federal land purchases. The relevant statute presently provides:

> Unless the Attorney General gives prior written approval of the sufficiency of the title to land *for the purpose for which the property is being acquired* by the United States, public money may not be expended for the purchase of the land or any interest therein.

40 U.S.C. § 255 (emphasis added).[3] This approval requirement, *see, e.g.*, 6 Op.

---

[1] The Draft Agreement states:
4. NOW, THEREFORE, THESE PRESENTS WITNESSETH, that the said party of the first part, in consideration of the premises, and in the further consideration of the sum of $48,000 lawful money of the United States, by the second party to the first party in hand paid, the receipt whereof is hereby confessed and acknowledged, has granted and by these presents does grant unto the party of the second part, its successors and assigns, a right-of-way in perpetuity for the purpose of constructing, reconstructing, operating and maintaining a Consolidated Space Operations Center and for other governmental purposes, upon, over, under and across the surface of those certain portions of school lands described as follows. All of Section 26, Township 14 South, Range 64 West of the Sixth Principal Meridian, El Paso County, Colorado. Containing 640.00 acres, more or less.

[2] *See* 5 Stat 468 (1841). *See also* 39 Op. Att'y Gen. 73 (1937); 39 Op. Att'y Gen 56 (1937); 35 Op. Att'y Gen. 183 (1927), 28 Op Att'y Gen. 463 (1910), 28 Op. Att'y Gen. 413 (1910); 10 Op. Att'y Gen. 353 (1862); 10 Op Att'y Gen. 34 (1861); 9 Op. Att'y Gen 100 (1857). The provision also appears at 33 U S.C. § 733 and 50 U.S.C § 175.

[3] Attorney General Cushing outlined the policy reasons for requiring such title approval at some length:
I have acted, in all these references, under the conviction that the tenor of the law requires that all titles which the United States may take by purchase shall be perfect ones. The Government needs the land for the purpose of the public buildings to be erected on it, and needs, therefore, to hold it against all suit. Damages on a warranty will not suffice to indemnify the Government for the inconveniences following ejectment, even if, which would rarely happen, such damages could be recovered. . .
And, in all these respects, the Government buys in order to own for the public service, not to hold temporarily as a proprietor buying and selling for the chances of gain, and so taking the risk of any defects of title A private person may buy a piece of land of dubious title, and consider that in the price Not so in the case of the United States.
In addition to all these considerations, leading to the same conclusion, is another one of importance If there be a flaw in the title of a private person, he can defend it on equal terms with any adverse claimant, and in due time obtain adjudication of the matter in the courts of justice, with
Continued

432

Att'y Gen. 432 (1854), provides a decisionmaker who, applying uniform rules, is responsible for ensuring that the United States' interests are protected.

In 1970, the Department of Justice proposed that the authority to approve land titles be given to the heads of all departments and agencies. 116 Cong. Rec. 10602 (1970). After study, the House rejected this approach and adopted a revised version that retained primary responsibility in the Attorney General.[4] *See* H.R. Rep. No. 970, 91st Cong., 2d Sess. (1970); S. Rep. No. 1111, 91st Cong., 2d Sess. (1970). This version became the present law. 40 U.S.C. § 255. The Attorney General was given the discretion to delegate the authority, and the Attorney General has in fact delegated it to several agencies, including the Corps of Engineers.[5] The delegation is, however, subject to the Attorney General's general supervision and regulations, which are discussed *infra*.[6]

The Air Force has asked the Corps of Engineers to acquire the land in Colorado without obtaining the Attorney General's written approval based upon the belief that the title need not be approved by anyone. The Air Force bases its argument on language in the statute authorizing acquisition of the CSOC land.

> The Secretary of each military department may proceed to establish or develop installations and facilities under this Act. . . . The authority to place permanent or temporary improvements on land includes authority for surveys, administration, overhead, planning, and supervision incident to construction. *That authority may be exercised before title to the land is approved under section 355 of the Revised Statutes (40 U.S.C. 255),* and even though the

vindication of the title if it be a valid one, or compromise on fair conditions; and so the question ends. But if there be any flaw in the title of property held by the Government, the most exaggerated demands are made as the condition of release; the actual defects of title are magnified by ingenious self-interest; the pretensions of the adverse claimant are plausibly brought before Congress, the members of which are surprised into erroneous views of the question by *ex parte* showings; favorable reports of committees are obtained, by local interest or the partiality of friends, in one House or the other, and thus, even where the adverse claim is a bad one, enormous expense and trouble will come to be devolved on the Government.
8 Op Att'y Gen. 405, 406–07 (1857).

[4] The committee concluded that the Attorney General as the chief law officer of the United States should be charged with the primary responsibility for the approval of land titles. While it is clear from the executive communication and the testimony produced at the hearings on both bills that this authority can be properly exercised by other departments and agencies in many instances, the committee felt that there should be a determination of whether an individual department or agency in fact had the capability of exercising this authority or, has an actual need for such authority in terms of its operation. Accordingly, instead of making the grant of this authority by legislative determination, it was felt that the Attorney General would be in a better position to determine whether a delegation of the authority should be made. It was also felt that the Department of Justice would be in a better position to supervise the exercise of the authority if it was clear that the primary responsibility was lodged in the Attorney General.
116 Cong. Rec. 10602 (1970).

[5] *See* Letter for Secretary of the Army Resor from Acting Assistant Attorney General Kiechel, Oct 14, 1970.

[6] The Attorney General may delegate his responsibility under this section to other departments and agencies, subject to his general supervision and in accordance with regulations promulgated by him.
Any Federal department or agency which has been delegated the responsibility to approve land titles under this section may request the Attorney General to render his opinion as to the validity of the title to any real property or interest therein, or may request the advice or assistance of the Attorney General in connection with determinations as to the sufficiency of titles.
40 U.S.C. § 255. *See* 28 C F R § 0 66 (1981) (Land and Natural Resources Division to pass on land titles and exercise delegation authority)

land is held temporarily. The authority to acquire real estate or lands includes authority to make surveys and to acquire land and interests in land (including temporary use), by gift, purchase, exchange of Government-owned land, or otherwise.

Military Construction Authorization Act, § 701, Pub. L. No. 97–99, 95 Stat. 1359, 1375 (1981) (emphasis added). We concur with your judgment that this language permits the Corps, on behalf of the Air Force, to begin work on the land before title has been approved under 40 U.S.C. § 255. We also agree that § 701 does not remove the requirement that the Attorney General or his designee approve the sufficiency of the title.

The language italicized above is not a complete exemption from 40 U.S.C. § 255—it is a descendant of statutes, dating back at least to World War II, that are designed to give the military the flexibility to start work on a needed project before every last step in the process of acquiring title has been formally approved. There are only a few statutes that grant a complete exemption to 40 U.S.C. § 255,[7] and their existence and language make clear that Congress knows how to draft a statute providing a complete exemption.[8] The Air Force's statute is one of a similarly small number of statutes, generally related to military operations, which, in the interests of efficiency grant a limited exception to the requirement that the review be done *before* work can be started.[9] "In the absence of emergencies, the Congress has shown extreme reluctance, in the matter of land acquisitions, to dispense with the opinion of the Attorney General upon the validity of the title." 39 Op. Att'y Gen. 73, 79–80 (1937).

Because of the Air Force's concern with this issue, we have carefully reviewed the material which it forwarded to you outlining the legislative history of similar provisions found in earlier military construction statutes.[10] The emphasis on ensuring that urgent military projects can be started as soon as possible is a repeated theme in that material, but there is nothing in it that casts doubt on the continued applicability of 40 U.S.C. § 255.

> Section [701] . . . in connection with the construction for the special-weapons project, authorizes the commencement of construction prior to approval of title to such lands by the Attorney General as normally required by [40 U.S.C. § 255]. These exemptions . . . would where time factors dictated immediate action, expedite the acquisition of land and commencement of construction.

S. Rep. No. 923, 81st Cong., 1st Sess. 21–22 (1949). The same concerns were echoed a few years later.

---

[7] *See* 48 U.S.C. § 1409b, 42 U.S.C § 1502(b); 36 U.S.C. § 138b; 22 U.S.C § 1471(3) (Supp III 1979); 16 U.S.C § 571c; 16 U.S.C § 343b, 7 U S.C. § 2250a.

[8] *See, e.g* , 48 U S.C. § 1409b ("Projects authorized by this subchapter may be constructed without regard to the provisions of Section 255 of title 40").

[9] *See* 50 U.S.C. App § 2281(h); 50 U S.C. App. § 460(b)(9); 42 U.S C. § 2224, 42 U.S.C. § 1594a(d); 40 U.S.C. § 356(j)(1).

[10] Letter from Assistant General Counsel Reynolds, Department of the Air Force to Deputy Assistant Attorney General Liotta, Land and Natural Resources Division, Mar. 3, 1982

> Section [701] also *softens the effect of [40 U.S.C. § 255]* when military requirements call for immediate construction. It does not avoid the requirement of the Revised Statutes that title to land be approved by the Attorney General, but it does avoid the necessity of condemning land and filing a declaration of taking, which of itself may be time-consuming, in every case in which construction is required on an urgent basis.

S. Rep. No. 1707, 83d Cong., 2d Sess. 13–14 (1954) (emphasis added).[11] Given this legislative history, the traditional importance assigned to title approval under 40 U.S.C. § 255, and the fact that exceptions to the statute are clearly drafted, *see* n.8, *supra,* we cannot agree with the Air Force that § 701 completely exempts its projects from any review under 40 U.S.C. § 255.[12] Rather, we concur in your judgment that § 701 permits the military to begin construction on the land prior to title approval—but still subjects it to the Attorney General's final determination as to the sufficiency of the title.[13]

### III. The Effect of the Attorney General's Regulations

The Attorney General has delegated to the Corps of Engineers his authority to approve land titles.[14] This authority is "subject to his general supervision and in accordance with regulations promulgated by him." 40 U.S.C. § 255. The Attorney General has promulgated such regulations, which state clearly which land titles may be approved. *Regulations of the Attorney General Promulgated in Accordance With the Provisions of Public Law 91–393,* Oct. 2, 1970 (Regulations). These Regulations state, in relevant part:

#### 5. CHARACTER OF TITLE WHICH MAY BE APPROVED

> (a) The agency must determine that the proposed interest in property is in accord with the authorizing legislation and that such interest is sufficient for the purposes for which the property is being acquired—also that the purchase price is commensurate with such interest.
> (b) Frequently vendors desire to convey lands to the Govern-

---

[11] *See also Military and Naval Construction. Hearings on H R. 7130 and H R  8240 Before the House Comm. on Armed Services.* 85th Cong., 1st Sess  2249 (1957) The Chairman of the Committee. Rep  Vinson, questioning whether a 99-year lease for a base had ever been approved, said, "Of course, the policy of the committee and the policy of the Congress has been not to make any permanent installations on land unless the fee is in the Government "

[12] The GAO has also noted that the Attorney General's approval is necessary  *See* GAO Final Report on CSOC Acquisition, Ch  3, at 12 ("the Air Force must still obtain approval by the U S. Attorney General before funds can be spent to acquire the right-of-way to use Colorado lands")  *See also* 47 Comp  Gen  61, 64 (1967).

[13] If the Attorney General does find the title insufficient, and negotiations are inadequate to acquire a better title, the government's interests can still be protected by its ultimate authority to have the property condemned and taken for a governmental purpose. *See, e.g., United States* v  *South Dakota,* 212 F.2d 14 (8th Cir  1954) (Rapid City Air Force Base)  Of course, the government must have sufficient money appropriated to cover the cost of just compensation

[14] *See* n.5, *supra*

435

ment by deeds which contain provisions for the reversion of the title when the property ceases to be used for a specified purpose. Also there may be restrictive covenants or agreements in conveyances to prior owners under which the title might revert to the grantors in such deeds upon the use of the property for an unauthorized purpose or for other reasons. *When permanent type improvements or improvements of substantial value are to be erected on lands, a defeasible title to such lands is not acceptable and must not be approved, unless the estate is clearly authorized by the Congress.*

(c) Other covenants and conditions in the deeds to the United States or in prior deeds may limit the use of the property in a manner which may prevent the sale and disposition of the property under laws relating to the disposition of surplus property so as to prevent the recovery of a substantial portion of the Government's investment in the property. Titles are not acceptable which are subject to such covenants and conditions in the absence of clear authorizing legislation.

*     *     *     *     *

(f) A defeasible fee title to land may be acquired by purchase or donation when no permanent improvements are to be created thereon, provided that the statute authorizing the acquisition in question does not preclude acquisition of title to the interest which the agency intends to acquire, the interest intended to be acquired is sufficient to permit the use of the land contemplated, and the consideration for the land has been determined with reference to the value of the limited interest that is acquired. *In the event it is decided at some future time to erect permanent improvements on such land, the provision for defeasance must be eliminated. Exceptions to the foregoing restrictions and requirements may be made only by the Attorney General, in individual instances when warranted in the interests of the United States.*[15]

Regulations, 5(a)–(c), (f) (emphasis added).

Thus, unless the estate is "clearly authorized by the Congress," less than fee simple titles for lands on which the United States is placing permanent improvements may not be approved by the Corps of Engineers.

The Air Force argues that the estate—a right-of-way subject to a reversion interest—has been "clearly authorized" by § 701 of the Military Construction Authorization Act, *supra*. Section 701 permits the authority to place permanent improvements on land to "be exercised before title to the land is approved under [40 U.S.C. § 255], and even though the land is held temporarily."

---

[15] This last sentence was added in 1974

436

The Air Force states that it forwarded "DD Forms 1391" to its oversight committees from 1969 to 1977, and that these forms contained lines indicating that some of the land being used for air bases was under long lease. Letter from Assistant General Counsel Reynolds, Department of the Air Force, to Deputy Assistant Attorney General Liotta, Land and Natural Resources Division, March 3, 1982. The Air Force therefore concludes that, since the forms were printed in the Committee hearings, this is "powerful proof that the practice of construction on land held in other than fee under appropriate circumstances is an approved one." *Id.* at 2. *But see TVA* v. *Hill,* 437 U.S. 153, 191–93 (1978); *supra* n.11.

We disagree with the Air Force's analysis. We believe that the phrase "even though the land is held temporarily," read in context, permits the Secretary to build on land held temporarily—*e.g.,* through a lease—while the Attorney General scrutinizes the title. We have previously stated our belief that statutes granting general authority to purchase lands and interests in lands are not enough to constitute the clear authorization needed to overcome the Regulations. "[N]othing short of a direct and specific approval by Congress of a particular acquisition will suffice whenever substantial improvements are to be made and the acquisition of less than fee title is contemplated." Memorandum for General Counsel Coleman, Department of Energy, from Deputy Assistant Attorney General Hammond, Office of Legal Counsel, August 28, 1979 at 8 (Energy Memorandum) (rejecting servitude interest).[16] Section 701 was not meant to overrule the Attorney General's outstanding regulations, regulations that reflect an administrative practice dating back to the nineteenth century that insists that the government obtain a fee title when making permanent improvements. There is nothing in the legislative history of § 701 or its predecessors that indicates Congress meant to reject this rule in favor of letting valuable military establishments be placed on any kind of estate that the military happens to obtain. Rather, the emphasis is on the need for speed and efficiency in beginning work on military projects. The Air Force's interpretation would encourage the military to obtain the cheapest—and hence, often the weakest—land interests available, a goal at odds with the Attorney General's oversight role and Congress' own interest in ensuring that valuable improvements are not placed at risk.[17] If a temporary interest were sufficient for permanent improvements, there would never be a need for the Attorney General to pass on the sufficiency of the title.

The issue need not be resolved, however, because the central issue in this dispute is whether the Attorney General is willing to approve the title to this land.[18] Even if we found that § 701 "clearly" authorized acquisition of less than

[16] The statute in that case authorized purchase of any possessory right, including easements, leaseholds, and mineral rights. *Id.* at 2

[17] We would note that this policy is already reflected in 10 U.S C § 9773(d) which deals with Air Force acquisition of land for regular "air bases and depots." 10 U.S.C § 9773(a) When the Secretary of the Air Force needs land, he may acquire "title, in fee simple and free of encumbrance." *Id* § 9773(d)

[18] The Regulations mandate that the Attorney General's opinion be requested by the agency to which a delegation has been made both when an exception is sought to the fee simple requirement, *see* Regulations, 5(f), and when the land is subject to a reversionary interest *Id.* 5(g). "When it is desired to accept the title to lands, subject to any rights of reversion, *the opinion of the Attorney General must be requested* and full supporting facts containing a reference to any authorizing authority must be submitted for consideration " (Emphasis added ) *See also* Regulations, 5(h) ("Federal departments and agencies must exercise sound legal judgment in determining the validity of titles to lands and, in case of doubt of such validity, the Attorney General must be requested to render his title opinion pursuant to the above-mentioned Act prior to the payment of the purchase price ")

fee interests, which we do not, the next step would still be an examination of whether the Attorney General should approve the title. The next section sets forth various reasons why we believe the Land and Natural Resources Division, acting on behalf of the Attorney General, may wish to disapprove the title proffered for the CSOC land.

## IV. The Attorney General's Broad Duty Under 40 U.S.C. § 255

"These regulations recognize that Congress may authorize the acquisition of *any* interest in real property . . . no matter how risky, but they also recognize that 'it is very seldom that a particular interest is authorized by legislation.' Regulation 4(a)." Energy Memorandum, at 4. There is nothing in the language of 40 U.S.C. § 255 which requires that the Attorney General only approve fee simple titles when permanent improvements are planned. Nevertheless, the Attorney General has chosen to narrow his own discretion by issuing the Regulations prescribing limits on the kind of title that may be approved when the government wishes to erect permanent improvements. The Regulations bind both the Land and Natural Resources Division, which is acting for the Attorney General, and the agencies to whom approval authority has been delegated.

When Congress revised 40 U.S.C. § 255 in 1970, it discussed the factors to be considered in evaluating whether a title is sufficient for the purpose for which the property is being acquired. That evaluation involves more than determining that there is no cloud on the title. As the House Report stated,

> [Agencies already make] determinations [that] relate to the propriety, timing and scope of acquisition, as well as the development, use and disposition of such properties. *Whether the interest in land,* that is the title being acquired, *is sufficient for the purpose of a program or presents unwarranted risks for the United States* involves a similar sort of determination under current practices.

H.R. Rep. No. 970, *supra,* at 5 (emphasis added). *See* Regulations, 5(a), *supra.*

In order to provide you with some observations concerning the exercise of your discretion regarding whether the proposed title is sufficient for government purposes, we have done a brief review of applicable Colorado law. While we are by no means experts on Colorado law, our review has raised issues for you to consider. We concur with your tentative view that the right-of-way offered by Colorado is not sufficient for the Air Force's purposes for a variety of reasons. There are persuasive arguments that a right-of-way subject to a reversion is not adequate to protect the interests of the federal government. Moreover, there is a risk that the Colorado State Board of Land Commissioners' transfer of the land *via* a deed to a right-of-way rather than by sale of the fee interest would be beyond the scope of its powers under the Colorado Constitution and implementing statutes.

The Board has limited authority, deriving its powers from the Colorado Constitution, Colo. Const. art. IX, §§ 9, 10,[19] and implementing statutes.

---

[19] "It shall be the duty of the State board of land commissioners to provide for the . . . sale or other disposition of all the lands     in such manner as will secure the maximum possible amount therefor" Colo. Const. art. IX, § 10.

Colorado jurisprudence has long held that, as a creature of limited authority, the Board may not act beyond its authority, and that when it does, its actions are null and void. For example, the Colorado Supreme Court, nullifying a land sale because the Board had not properly advertised the land, has said:

> Whatever power the board possesses to sell state lands *or any part thereof* is derived from the Constitution, and the manner or method to be pursued by it in selling or conveying the same is to be in accordance with some legislative act prescribing or regulating the steps to be taken. Hence, when the board attempts to dispose of the state lands under its lawful powers, *a failure on its part to substantially comply with the requirements of the legislative act concerning such disposition leaves the title unaffected,* and conveys no title in the land to the purchaser. Under such circumstances the acts of the board, in executing or delivering any deed or other muniment of title to the land, are ultra vires.

*Briggs* v. *People,* 121 P. 127, 128–129 (Colo. 1912) (*en banc*) (emphasis added). *See also Driscoll* v. *State Bd. of Land Comm'rs,* 23 F.2d 63, 64 (8th Cir. 1927), *cert. denied,* 277 U.S. 586 (1928); *Evans* v. *Simpson,* 547 P.2d 931, 934 (Colo. 1976) (*en banc*); *Walpole* v. *State Bd. of Land Comm'rs,* 163 P. 848, 850, 851 (Colo. 1917).

The Board's action may be open to challenge on the grounds that the transaction is a "sale," governed by Colo. Rev. Stat. § 36–1–124, rather than the grant of a right-of-way, *id.,* § 36–1–136 (1980 Cum. Supp.).[20] A right-of-way may be granted to the United States "on any tracts of state land," *id.,* while the Draft Agreement would grant it "upon, over, under and across the surface" of the land. Draft Agreement, ¶ 4.[21] The Colorado Constitution requires that the "sale or other disposition" of state lands must "secure the maximum possible amount therefor." Colo. Const. art. IX, § 10. Sales and leases are, therefore, publicly advertised and auctioned, unlike this transaction. A disappointed land seeker

---

[20] "The state board of land commissioners . . may grant rights-of-way *on* any tracts of state land to any public agency or instrumentality of the United States . . for any public use or purpose." (Emphasis added )

[21] We are also concerned that the Board does not have the authority to grant a right-of-way that conveys such an extensive interest. Even the Board's more general authority is only to grant rights-of-way "across or upon" certain tracts Colo. Rev Stat. § 36–1–136 (1980 Cum. Supp ) The GAO's analysis of this transaction expresses some doubts as to its legality but concludes that there is no real problem since the United States can always condemn the property

> The Air Force and State are evidently treating this transaction as a grant of right-of-way falling under the statute rather than as a sale or other disposition falling under the constitutional provision Whether this is correct is a question of State law Generally, GAO will not question a State's interpretation of its own law. The Board's counsel advised us that the Board does not believe the constitutional provision applies and therefore that the Board is not required to secure the maximum possible amount.

> The possibility exists that the legality of the conveyance could be challenged in a lawsuit While the possibility of litigation cannot be foreclosed, it is in our judgment not likely. Moreover, as mentioned earlier, the United States may condemn without delay whatever interest in land it needs, should any doubt later arise as to the legality of the conveyance by the State. With that option available, and given the Board's view that it has legal authority to convey the right-of-way, we find no legal reason for the Air Force not to go ahead with the acquisition as planned

GAO Op No B–205335, at 3, *reprinted as* Appendix IV to GAO Final Report on CSOC Acquisition Condemnation may provide a remedy when the title proves insufficient, but it does not answer the question of whether a title is in fact sufficient under 40 U S C § 255

might argue that, no matter how the Board denominates the transaction, it is actually a sale, which must be advertised to produce the maximum return, Colo. Rev. Stat. § 36–1–124, or a lease, *id.* § 36–1–118(1)(a), which can be for a term of no more than ten years.[22] The land is presently being leased to a private user for grazing purposes,[23] and the lessee's interests are being conveyed to the United States for $1,950.[24]

Our second concern is that a right-of-way would appear to be insufficient for the Air Force's purpose. The section authorizing the Board to grant rights-of-way "shall not be construed to grant authority to said board to convey title to any such land by a grant of right-of-way." *Id.* § 36–1–136 (1980 Cum. Supp.). Under Colorado law, therefore, there is no "title" conveyed to the United States that the Attorney General can examine for sufficiency.

Even if we assume, however, that the meaning of "title" in 40 U.S.C. § 255 is broader than the "title" under Colorado law, so that there is a "title" to the right-of-way that the Attorney General can examine, that "title" would seem to be entirely too precarious for the Air Force's purposes. First, rights-of-way and easements belonging to the United States may be condemned in state court upon the application of any corporation authorized under Colorado law to condemn public lands. Colo. Rev. Stat. § 38–3–101.[25] This would expose the United States to the constant threat of new rights-of-way circumscribing the Air Force's use of parts of the tract as corporate pipelines, telephone wires and access roads are erected, and to the need either to pay the corporations to choose some other route, engage in litigation to forestall the condemnations, or, eventually, to condemn the tract itself and pay the state for the taking.[26]

Second, all Colorado state institutions, departments, and agencies, *id.* § 24–82–201, as well as the Board, can grant easements or rights-of-way over

---

[22] The Board hears claims on lands, Colo Rev Stat. § 36–1–131 (Cum. Supp. 1980), but its decisions may be challenged by any interested party. *See, e g.. Wilson* v *Collins,* 165 P 2d 663 (Colo. 1946) *(en banc)* (taxpayers could maintain mandamus action to force Board to collect rents owed on State land); *People ex rel Stonebraker* v. *Wood,* 10 P 2d 331 (Colo 1932) The uncertainty inherent in state land law decisions is another reason that the Attorney General has always insisted on an irreproachable title to land

But, if the question presented have not been so adjudged in the State, if it be a new point of construction presented by the statutes of a State,—the Attorney General would take upon himself burdens of responsibility, not justified by any emergency in the mere matter of expediency of selection between this or that site of a court house or post office, or of paying more or less money for a site, if he should presume to warrant to the Government what will be the decision of the courts of the particular State on the construction of their own statutes, especially where the United States are concerned.

8 Op. Att'y Gen. 405, 408 (1857).

[23] *See* Quitclaim Deed attached to Draft Agreement

[24] One of the potential issues for litigation is the extent of the present lessee's rights, specifically reserved to him, under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C § 4601 *et seq.* Quitclaim Deed, at 1.

[25] The list of corporations possessing the power of condemnation is fairly broad. *See* Colo Rev. Stat. §§ 38–2–101–105.

[26] In a recent decision, the Colorado Court of Appeals upheld the Board's grant of a right-of-way for a railroad over mining lands leased from the State, despite the lessee's objections. *Utah Int'l, Inc.* v *Bd of Land Comm'rs,* 579 P.2d 96 (Colo 1978). The Court held that the lessee was not adversely affected because it had no immediate plans to mine the coal under the proposed right-of-way. If the railroad, once built, did interfere with the mining, the Court indicated that the remedy was a damage action, 579 P.2d at 97, not removal of the railroad Unless the Air Force plans to build on all 640 acres immediately, private parties could similarly narrow the government's ability to use the entire tract. *See also Bd of Land Comm'rs* v. *District Court,* 551 P 2d 700 (Colo. 1976) *(en banc)*

440

land owned by the state. We are not aware of anything in the Draft Agreement that would preclude a state agency or the Board from granting another right-of-way over part of the CSOC tract—which would still be owned by the state.

Third, the Attorney General has traditionally not approved titles to property where there is a reversionary right.

> Acceptance of such a title could result in the loss of extensive investments made by the United States in improvements on the property. There is no assurance that the Congress will continue to appropriate funds for an intended use, thereby causing the title to the lands and the improvements to revert to the [State]. Furthermore, provisions allowing the Government to remove the improvements in the event of such reversion are usually meaningless since the cost of removing permanent expensive buildings is generally greatly in excess of any sale of the salvage from the building.

Memorandum for Director Zwick, Bureau of the Budget, from Deputy Attorney General Christopher, Sept. 10, 1968, at 1. The Draft Agreement provides for reversion whenever the land is not being used for a governmental purpose and does not even include a right to salvage the permanent improvements. Rather, the United States could either sell the improvements or abandon them—in which case they revert to the state. Draft Agreement, ¶ 13.[27]

The lack of any "title" under state law and the precarious nature of rights-of-way under Colorado law are the very kinds of flaws that an Attorney General's review are meant to detect. 8 Op. Att'y Gen. 405, 407 (1857).[28] The Attorney General's duty is to protect the federal government from the harassment and possible financial loss that could result from a less than sufficient title. The proffered "title" to the right-of-way seems to be seriously insufficient for the site of a multimillion dollar military complex. We are aware of nothing which would prevent the Air Force from buying the land,[29] and we recommend that course of action.

## V. Conclusion

We believe that the Land and Natural Resources Division has correctly determined that the Attorney General must examine the title for the right-of-way

---

[27] The right-of-way is also made subject to outstanding rights-of-way and easements Id. ¶ 6. The Board has assured the Air Force that none exists, but if any should come to light, their continued existence would raise the same problems outlined above

[28] A policy implication that may need further consideration is that the Draft Agreement reserves both mineral and water rights. Id. ¶¶ 5. 9 The United States cannot even explore for water without the state's permission Id ¶ 9 Water rights which may be sufficient now for the Air Force's purposes may well be insufficient in a decade or so when the CSOC is a center of activity with personnel and their families living on the tract Colorado is not a water-rich state, and development of the CSOC may be severely curtailed if Colorado refuses to permit exploration, while any water flowing through the tract may be appropriated by others in the interim In the same way, it would seem wiser to acquire now the title to subsurface mineral interests, such as geothermal resources and oil, rather than wait and pay an almost assuredly higher price to the state in a few years Moreover, their purchase would place control of exploration and exploitation in the federal government, which could ensure that they did not conflict with the CSOC's mission.

[29] See Colo Rev. Stat § 3–1–101.

441

and that, acting on behalf of the Attorney General, it should advise the Corps of Engineers that the interest conveyed by the Draft Agreement to a right-of-way in the tract is not sufficient for the purpose for which the property is being acquired.

ROBERT B. SHANKS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*